UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Leatherwood Scopes International, Inc.,

Civ. File No. 00-817 (PAM/JGL)

Plaintiff,

v.

**MEMORANDUM AND ORDER**

James M. Leatherwood
d/b/a Leatherwood Optics,

Defendant.

---

This matter is before the Court upon Plaintiff's Motion for a Preliminary Injunction. For the reasons stated below, the motion is denied.

**BACKGROUND**

Defendant James M. Leatherwood ("Leatherwood") is the inventor of certain rifle scopes that compensate for bullet drop caused by gravity. Leatherwood was an officer, director, and shareholder of Tri Continental Trading Corporation ("Tri Continental"), which manufactured and marketed the scopes known as adjustable ranging telescopes ("ART"). These included three different scope models: the ART Tel, the ART II, and the ART/MPC ("MPC").

Randy Luth ("Luth") of Defense Procurement Manufacturing Services ("DPMS") was a major customer for the ART II scopes. In 1995, Luth formed Plaintiff Leatherwood Scopes

FILED SEP 0 5 2000
FRANCIS E. DOSAL, CLERK
JUDGMENT ENTD________
DEPUTY CLERK________

International ("LSI"), which entered into agreements with Tri Continental to purchase the assets, technology, and goodwill related to the ART Tel and ART II Scopes. These agreements included a July 17, 1995 Asset Purchase Agreement, under which Tri Continental sold to LSI, for $50,000, "[t]he names 'ART II' and 'ART Tel Scopes,' commonly known as Leatherwood ART II and ART Tel Scopes," as well as "[a]ny goodwill concerning the business of manufacturing, assembling, and selling ART II and ART Tel Scopes," along with drawings and blueprints, inventory, assembly and test fixtures, and vendor and customer lists. (See Luth Decl. Ex. 1 at 1-3.) On the same day, Tri Continental and Leatherwood also entered into a Noncompetition Agreement with LSI. In that agreement, Tri-Continental and Leatherwood agreed not to manufacture, assemble, or sell "ART II and ART Tel Scopes, commonly known as Leatherwood ART II and ART Tel Scopes internationally," and not to "manufacture, assemble, or sell any products or services involving the ART II or ART Tel Scopes or otherwise solicit any such business from any current or prior customers . . ." (See Luth Decl. Ex. 2 ¶¶ 2-3.)

In June 1998, Leatherwood began marketing the "Leatherwood Sporter" scope, based on the MPC scope, through his company, Leatherwood Optics. On April 3, 2000, LSI, believing that the sale of the Sporter violated the contracts and infringed its trademark rights, filed the present lawsuit, which includes thirteen counts: (1) trademark infringement; (2) trademark dilution; (3) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a); (4) unfair competition under the common law; (5) deceptive trade practices in violation of

Minn. Stat. § 325D.43 et seq.; (6) unlawful trade practices in violation of Minn. Stat. § 325D.09 et seq.; (7) false advertising in violation of Minn. Stat. § 325F.67; (8) violation of right of publicity; (9) violation of the anti-cybersquatting consumer protection act, 15 U.S.C. §§ 1116(a), 1117(a), and 1117(d); (10) breach of asset purchase agreement; (11) breach of the noncompetition agreement; (12) unjust enrichment and quantum meruit; (13) promissory estoppel. On May 5, 2000, Leatherwood registered the trademark LEATHERWOOD® with the U.S. Patent & Trademark Office for use with rifle scopes and other optical equipment, based on his first use of that term in commerce in 1969. See U.S. Patent & Trademark Office Principal Register, Serial No. 76042346 (visited Aug. 30, 2000) <http://tess.uspto.gov/bin/gate.exe?f=doc&state=t73lcv.2.2>.

Presently before the Court is LSI's Motion for a Preliminary Injunction, based both on its rights under the Lanham Act and on its contract rights from the Asset Purchase Agreement and Noncompetition Agreement. LSI seeks to preclude Leatherwood from using the LEATHERWOOD® mark in conjunction with rifle scopes.

**DISCUSSION**

To obtain preliminary injunctive relief, LSI must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if preliminary relief is not granted; (3) the balance of hardships weighs in its favor; and (4) the public interest favors granting preliminary injunctive relief. See Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 114 (8th Cir. 1981). Because a preliminary injunction is an extraordinary remedy, the moving party has the burden of establishing its necessity. See In re Travel Comm'n Antitrust Litig.,

898 F. Supp. 685, 689 (D. Minn. 1995).

Because LSI's bases its rights under the Lanham Act to the LEATHERWOOD® mark on its purchase from Leatherwood, the merits of its arguments under the July 17, 1995 Asset Purchase Agreement are critical to the LSI's likelihood of success in this motion. However, it is unclear from the terms of the agreement exactly what trade names LSI purchased from Leatherwood. The agreement provides for the sale of "[t]he names 'ART II' and 'ART Tel Scopes,' commonly known as Leatherwood ART II and ART Tel Scopes." (See Luth Decl. Ex. 1 ¶ 1.)

Leatherwood argues that LSI purchased only the names that appeared within quotations—that is, the names "ART Tel" and "ART II"—not the name "Leatherwood" itself. The phrase "commonly known as Leatherwood ART II and ART Tel Scopes" merely acknowledges that the ART II and ART Tel Scopes were previously long associated with Leatherwood. This interpretation seems plausible. If LSI wanted Leatherwood to give up his own name, and his livelihood designing rifle scopes, it should have done so expressly and unambiguously, particularly because Leatherwood at that time also had at least one other rifle scope, i.e., the ART/MPC. (See Answer Ex. 2; Leatherwood Aff. ¶ 5.) On the other hand, because the agreement reflects that the buyer was LSI—Leatherwood Scopes International, Inc.—at the very least, Leatherwood knew that his name would be associated with the ART II and the ART Tel products. (See Luth Decl. Ex. 1.)

LSI argues that the phrase "commonly known as Leatherwood ART II and ART Tel Scopes" expands the scope of what was expressly conveyed by the particular names specified within quotation marks in the agreement (i.e., the "ART II" and "ART Tel" names) to implicitly also include the term "Leatherwood." This interpretation of the contract language also seems plausible.[1] Because of these conflicting interpretations of the agreement, there is sufficient ambiguity in the contract language to raise a question as to LSI's likelihood of success on the merits, particularly because LSI's attorney apparently drafted the agreements. (See Def.'s Opp'n Mem. at 11, 13.)

The other Dataphase factors have also been considered, but do not influence the outcome of the present motion. It is true that a likelihood of confusion may establish irreparable harm to a trademark holder. See General Mills, Inc. v. Kellogg Co., 824 F.2d 622, 625 (8th Cir. 1987). Moreover, evidence of actual confusion exists in the circumstances of this case. (See Luth Decl. Ex. 10.) However, it is unclear at this early stage of the proceedings which party risks suffering irreparable harm: LSI, which since 1995 has relied on Leatherwood's acquiescence in using the term "Leatherwood" in its organizational name,

---

[1] LSI has submitted an earlier draft agreement prepared by Tri Continental. (See Pl.'s Surreply Ex. A.). The draft states that Tri Continental "AGREES TO DELIVER TO LUTH ALL DRAWINGS. INVENTORY AS PER INSPECTION USED IN THE PRODUCTION OF THE ART II SCOPE. THE RIGHT TO USE THE LEATHERWOOD NAME AND TRADEMARK ON THE ART II AND THE ART TEL." (Id.) Even if the Court found this preliminary language to embody the parties' final intent, it is unclear whether Leatherwood intended to assign or merely license the "Leatherwood" name for LSI's use with the ART II and ART Tel products.

"Leatherwood Scopes International, Inc.," or Leatherwood, who presently holds his surname as a registered trademark for rifle scopes and other optical equipment based on its first use in commerce in 1969. Determining the proper party to which the irreparable harm flows will likely depend upon resolution of the somewhat ambiguous terms in the asset purchased agreement, as does the "balance of hardships" and "public interest" factors of Dataphase. Accordingly, these other Dataphase factors do not influence the outcome of the present motion.

**CONCLUSION**

For the foregoing reasons, and upon all of the files, records, and proceedings herein, the Court concludes that a preliminary injunction is not appropriate in this case. Accordingly, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for a Preliminary Injunction (Clerk Doc. No. 4) is **DENIED**.

Dated: September 1, 2000

Paul A. Magnuson
United States District Court Judge